## No. 14,301.

FIFTEENTH STREET INVESTMENT COMPANY *v.* PEOPLE.
(81 P. [2d] 764)

Decided July 11, 1938.

Messrs. BENEDICT & PHELPS, Mr. MITCHELL BENEDICT, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. ELMER P. COGBURN, Assistant, for the people.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

THE defendant in error, as plaintiff, brought an action against the plaintiff in error, a Colorado corporation, as defendant, in the district court of the City and County of Denver to collect certain use taxes alleged to be unpaid and owing by defendant by virtue of article 6, c. 144, '35 C. S. A. (sections 37 to 46 inclusive.) Judgment was for plaintiff. Defendant by writ of error seeks a reversal. For convenience the parties are herein designated as they appeared in the trial court.

The cause was tried on stipulated facts. So far as pertinent to the issues here involved the facts were as follows: April 7, 1937, defendant entered into a contract with the Otis Elevator Company of St. Louis, Missouri, which, omitting immaterial portions was as follows:

"We propose to furnish and erect the elevator installation as outlined in the foregoing specifications for the sum of Fifty-two Thousand Five Hundred and no/100 ($52,500.00) Dollars.

"The purchaser shall pay as an addition to the price herein quoted the amount of any tax based on sales made hereunder imposed by any law.

"Quotations are subject to change without notice.

"Payments shall be made pro-rata per elevator as follows: 70 per cent upon shipment of machine; 20 per cent when machine is in permanent position; and the remain-

ing 10 per cent when elevator is in complete running order. We reserve the right to discontinue our work at any time until payments shall have been made as agreed, and we have assurance satisfactory to us that subsequent payments will be made as they fall due.

"The purchaser agrees that in case he does not take delivery of the machine or material at the building when tendered, but not earlier than one month from the date of this agreement, he will immediately make the payments due upon shipment as provided above, and designate some local point where he will take delivery. He will further assume all warehousing and insurance charges. Upon failure of purchaser to designate within two weeks such point of delivery, we are authorized to warehouse machines or material within or outside of our factory at his risk and expense. * * *

"The machinery, implements and apparatus furnished hereunder remain personal property, and we retain title thereto until final payment is made, with right to retake possession of the same or any part thereof at the cost of the purchaser if default is made in any of the payments, irrespective of the manner of attachment to the realty, the acceptance of notes, or the sale, mortgage or lease of the premises.

"We hereby guarantee the material and workmanship of the apparatus furnished by us, under these specifications, and we will make good any defects, not due to ordinary wear and tear, or to improper use or care, which may develop within one (1) year from date of completion. * * *"

The above contract was signed by the parties.

It was further stipulated:

"That the Otis Elevator Company of St. Louis, Missouri, on or about March 27, 1937, agreed to construct, erect and install ready for use in said Gas and Electric Building four gearless, traction elevators for the sum of Fifty-two thousand Five Hundred Dollars (52,500.00).

"That the erection and installation of said elevators is

an addition to said real property and the improvements thereon, and when erected and installed will be affixed thereto and become a part of said real property.

"That said Otis Elevator Company apportioned the agreed price as follows:

"For materials...........................$42,625.00
"For labor............................... 9,875.00

"Total ...............................$52,500.00

"That at the date of filing the complaint herein the addition to said real property and improvements thereon consisted of the construction and installation of said elevators had not been completed or turned over to defendant herein, but was still and still is in progress, and defendant paid on account of said improvements and addition the sum of Thirteen Thousand One Hundred Twenty-five Dollars ($13,125.00) on July 9, 1937 and the further sum of Thirteen Thousand One Hundred Twenty-five Dollars ($13,125.00) on September 9, 1937 and no more.

"That on or about July 13, 1937, Homer F. Bedford as Treasurer as aforesaid demanded payment of a Use Tax of Two percent (2%) on the said total price of Fifty-two Thousand Five Hundred Dollars ($52,500.00) or one Thousand Fifty Dollars ($1,050.00)."

"That defendant exercised no control over said elevators prior to their being installed in the Gas and Electric Building."

Section 37, c. 144, '35 C. S. A., is the section of the statute which plaintiff relies upon as imposing the tax liability sought to be enforced in this action. It is as follows:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of storing, using or consuming in this state any article of tangible personal property purchased at retail subsequent to the effective date of this article. Such tax or excise shall be two (2) per cent of the purchase price of such tangible personal property."

Section 38 of chapter 144, '35 C. S. A., contains a legis-

lative declaration that the act imposing what is commonly known as the use tax, of which act section 37, supra, also is a part, is supplementary to the Emergency Retail Sales Tax Law of 1935, appearing as articles 1 to 36, c. 144, '35 C. S. A.

In the opinion of the Supreme Court of the United States upholding the constitutionality of an act of the state of Washington, similar to our act imposing a use tax, *Henneford v. Silas Mason Co., Inc.*, 300 U. S. 577, 57 Sup. Ct. 524, 81 L. Ed. 814, Mr. Justice Cardozo, speaking for the court, gives a clear exposition of the purpose sought to be accomplished by such laws: ''The plan embodied in these provisions is neither hidden nor uncertain. A use tax is never payable where the user has acquired property by retail purchase in the state of Washington, except in the rare instances in which retail purchases in Washington are not subjected to a sales tax. On the other hand, a use tax is always payable where the user has acquired property by retail purchase in or from another state, unless he has paid a sales or use tax elsewhere before bringing it to Washington. The tax presupposes everywhere a retail purchase by the user before the time of use. If he has manufactured the chattel for himself, or has received it from the manufacturer as a legacy or gift, he is exempt from the use tax, whether title was acquired in Washington or elsewhere. The practical effect of a system thus conditioned is readily perceived. One of its effects must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden. Another effect, or at least another tendency, must be to avoid the likelihood of a drain upon the revenues of the state, buyers being no longer tempted to place their orders in other states in the effort to escape payment of the tax on local sales.''

The plaintiff says that the stipulated facts bring defendant within the provisions of section 37, supra. Defendant says that such is not their effect. A determina-

576

tion of this question, except as to one incidental matter hereinafter noticed, if in accordance with plaintiff's contention, will dispose of the controversy.

Defendant has cited a number of cases as authority for the proposition that when a contractor uses materials in carrying out a contract for the erection of a structure upon, or the repair of a structure already upon, real estate that he is the ultimate consumer of the materials required to consummate his contract, and that he does not resell the materials entering into the construction under his contract so that those selling materials to him may claim such sales exempt from the sales tax as sales of material made for the purpose of resale. *State v. Christhilf,* 170 Md. 586, 185 Atl. 456; *State v. J. Watts Kearny & Sons,* 181 La. 554, 160 So. 77; *Atlas Supply Co. v. Maxwell* (N. C.), 194 S. E. 117, 118; *Albuquerque Lumber Co. v. Bureau of Revenue* (N. M.), 75 P. (2d) 334; *Herlihy Mid-Continent Co. v. Nudelman* (Ill.), 12 N. E. 638, 640. Plaintiff likewise cites a number of cases as authority for the proposition, that the contractor sells the materials entering into the construction work under his contract to the one for whom the work is performed under the contract. *Bradley Supply Co. v. Ames,* 359 Ill. 162, 194 N. E. 272; *Wiseman, Com'r v. Gillioz,* 192 Ark. 950, 96 S. W. (2d) 459; *Blome Co. v. Ames,* 365 Ill. 456, 6 N. E. (2d) 841; *Moore v. Pleasant Hasler Constr. Co.* (Ariz.), 72 P. (2d) 573. (Reversed on rehearing on other grounds— *Moore v. Pleasant Hasler Constr. Co.,* 76 P. [2d] 225.)

From a reading of the foregoing authorities it is clear that there is a division of opinion between the different state courts as to the legal effect of situations and statutes somewhat similar to the one before us. We find none of these cases dealing with the exact situation or statute here under consideration.

█ An examination of the contract convinces us that the elevators were purchased by defendant. The contract discloses among other things: That the Otis Elevator Company proposed "to furnish and erect the elevator

installation" for a price; that the "purchaser" was to pay "as an addition to the price herein quoted the amount of any tax," etc.; that "quotations are subject to change without notice;" that the "purchaser agrees that in case he does not take delivery of the machine or material," etc.; that "upon failure of purchaser to designate * * * point of delivery," etc. Such words and expressions are those commonly used in contracts of sale and purchase. We have little doubt that the Otis Elevator Company intended to sell and did sell the elevators to defendant and that defendant thought it was buying and did buy the elevators from the company. Their installation was but an incident to the sale and purchase. Moreover, the defendant assigns as error that the court failed to find, as was stipulated by the parties, that the total contract price of $52,500 was divisible as follows: for materials $42,625, for labor $9,875.

When the elevators were ready for delivery at the place of business of the Otis Elevator Company in St. Louis, Missouri, if shipped 70 per cent of the purchase price thereof became due under the contract and if they were not shipped the contract provides that if the purchaser (defendant) did not then take delivery that the seventy per cent payment due on shipment should then be due and payable and that the defendant would designate some "local point where he will take delivery" and assume warehousing and insurance charges, and that if such local point be not designated by the purchaser the elevator company might "warehouse" the elevators within or outside its factory at the purchaser's risk and expense. It cannot in reason be said that when the elevators were ready for shipment or storage that they were not then tangible personal property nor under the terms of the contract do we think it can be said in reason that at such time they had not been purchased by defendant.

██ Any contract for an improvement of real estate by the erection upon, or the repair of a structure already upon it, presupposes use of materials. Materials that

enter into such structure are tangible and before annexation to the realty are personal, not real, property. The owner of the real property who determines the nature and character of the structure to be erected or the repair to be made is the one who in reality and in the ordinarily understood sense of the term, makes the improvement of the real property. By the same token it is he who *uses* all of the materials entering into the structure or repairs upon one already existing. If the owner of the real property procures the materials and does the work himself there could be no question in the mind of any reasonable man as to who used the materials. When he engages another to erect the structure or to make repairs the act of making the improvement is still his act and the one contracted with or employed to do the work is but the means adopted for the accomplishment of his purpose. Such materials as he puts into the work are used by the one directing and controlling it.

It thus appears that we have all of the conditions requisite to the incidence of the use tax, that is, tangible personal property purchased by defendant at retail, the purchase not subject to a sales tax, the article purchased brought into the state of Colorado and used in making an improvement on his real property.

It is true, as defendant contends, that the improvement when made and the tangible personal property entering into it became real property. It is true also, as defendant contends, that when the elevators were used as such in the building that defendant was using real property, but prior to such use, and before being placed in the building the apparatus and materials constituting the elevator installation were personal property. It is the privilege of using it in the process of making the improvement that is taxable. The exercise of the privilege of using it resulted in the incidence of the tax. No subsequent use or failure to use the completed structure can relieve defendant from its payment.

But even if defendant's contention that the contract is

one for work, labor and materials, and that there was no direct retail sale of personal property to it be upheld, it avails it nothing. Defendant contends, and we think rightly, that the use tax is an entirely different tax from the sales tax. ''The privilege of use is only one attribute among many, of the bundle of privileges that make up property or ownership * * *. A state is at liberty, if it pleases, to tax them all collectively, or to separate the faggots and lay the charge distributively.'' *Henneford v. Mason, supra.* In *Bond v. Bourk,* 54 Colo. 51 (129 Pac. 223), this court said: ''The prevailing rule in American courts is that an agreement by one to construct an article particularly for and according to the plans of another, whether at an agreed price or not, although the transaction is to result in a sale of the article, is a contract for work and labor. The contract is for the manufacture and sale of a thing made to suit the fancy and serve the particular convenience and purpose of the defendant, without a market value for use in general trade, and therefore, although the agreement might result in the production and sale of a chattel, is one for work and labor, and not within the statute of frauds.'' Conceding that the contract in the instant case is one for work, labor and materials, not constituting a sale of the materials within the meaning of the term ''sale'' as used in the statute of frauds, we think even then it does not follow necessarily that there is not a sale within the meaning of that term as used in the revenue act in question. The statute of frauds deals with the contract relationship of the parties. The revenue act deals with the transaction of the parties as related to the state. It is to be noted that the opinion in *Bond v. Bourk, supra,* contains language that permits of such a distinction. The writer of that opinion recognizes the fact that such a transaction may ''result in the sale of an article'' but construes the contract between the parties as being one for work and labor primarily with the sale but an incident and therefore holds it not within the statute of frauds. If such a contract results in a sale

at retail, but is construed as not being within the statute of frauds so as to require a memorandum to make it enforceable because it is not directly a sale but merely results in an incidental sale, it is still difficult to see why the privilege of using such property if brought into Colorado and the right exercised to use it there should not be subject to a tax the same as it would be in a case where purchased directly but a memorandum made of the transaction sufficient to take it out of the statute of frauds. The statute of frauds relates merely to the manner of proving contracts of sale. That there is not competent evidence to prove a contract of sale does not negative its being in fact such a contract. Neither does it follow that a holding that a particular contract is not a contract of sale within the purview of the statute of frauds because it is not directly a contract for sale, but merely results in its consummation in a sale, requires a holding that the resulting sale is not cognizable as such under an entirely different legislative act. We think the public policy involved and the end sought to be attained by the statute of frauds, and that sought to be attained by the use tax, are entirely distinct. To hold otherwise would be to construe the use tax act in such a manner as would make it ineffectual to accomplish one of the purposes it was designed to accomplish, namely, to place those who purchase tangible personal property in Colorado, pay a sales tax and use the property in Colorado, on an equal basis as regards the tax burden with those who purchase such property outside of Colorado, do not pay a sales tax, and then use it in Colorado.

■ ■ We cannot, as a court, be ignorant of what all men know: that a contract involving labor and materials which become a constituent part of an improvement, the ownership of which passes to the owner of the real estate, involves a transfer of title to the materials for a consideration. That work and labor is to be done upon or in connection with the materials as an incident to or in connection with the transfer of title to the materials, does not

rob the transaction of its essential characteristics of a sale if the whole or any measurable part of the consideration for the performance of the contract is compensation for the materials. "In its broad sense a sale has been defined as the transfer of the property in a thing for a price in money or estimated in money, or in money or its equivalent, or for a valuable consideration; a transmutation of property from one man to another, in consideration of some price, or recompense in value; an exchange of goods or property for money paid or to be paid; the passing of the title and possession of any property for money which the buyer pays or promises to pay." 55 C. J. 37. When a word may be defined either in a broad sense or in a narrow or restricted sense and both definitions under varying conditions are recognized in the law, that definition should be applied to the word as used in a particular statute which will best effectuate the legislative intent in the enactment of the law. To define "sale" as used in the act before us in its restricted sense would enable a resident of Colorado, so disposed, to enter into a construction agreement with a contractor outside the state who would purchase his materials outside the state and thus the resident would avoid payment of either a sales or use tax, whereas a citizen of Colorado who employed a contractor within the state who purchased materials therein would be compelled to pay either directly or indirectly a sales tax. To so construe the law would be to nullify the legislative declaration of intention that the use tax is to supplement the sales tax. A construction that, in the words of Mr. Justice Cardozo in *Henneford v. Mason, supra,* "One of its effects must be that retail sellers in Washington [Colorado] will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden," is to make it effective in accomplishing what the legislature intended it should do, namely, to supplement the sales tax. And, as the writer of that opinion further pointed out, a further purpose of the act is that there may not be a drain

on the revenues of the state from the sales tax, by the placing of orders in other states to avoid the payment of a tax on local sales.

■ Our conclusion necessitates a determination of whether the state may collect a tax on the total cost of the elevator installed. The defendant contends that the cost of the labor should be deducted in determining the retail price. The plaintiff contends that the cost of installation is merely incidental and a trifle in value compared with the price of the materials sold. If we had nothing before us but the contract price, plaintiff's contention would not be without force, but the parties stipulated that of the total contract price, $52,500, $42,625 was for materials and $9,875 for labor. We think that it cannot reasonably be contended that an installation of the equipment involving so large an expenditure for labor, in proportion to the cost of the materials, was but incidental to the purchase of the equipment. We have no doubt that there are many cases to which the maxim "de minimis non curat lex" may properly be applied, but under the stipulation this case does not fall within that class.

The judgment imposing a tax measured by the cost of materials used in making the improvement is affirmed. In so far as it imposes a tax measured by the cost of labor entering into the making of the improvement, it is reversed.

MR. JUSTICE BOUCK not participating.