IN RE TAXES, KENNETH K. KOBAYASHI.

No. 4125.

JANUARY 10, 1961.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
HEWITT IN PLACE OF LEWIS, J., DISQUALIFIED, AND
CIRCUIT JUDGE HAWKINS IN PLACE OF FORMER
ASSOCIATE JUSTICE MARUMOTO, RESIGNED.

OPINION OF THE COURT BY CASSIDY, J.

This is an appeal taken by J. A. Bell as Deputy Tax
Commissioner of the Territory of Hawaii from a decision
of the tax appeal court holding invalid an additional as-
sessment of general excise tax against the appellee, a

building contractor. The assessment was on income claimed by the deputy tax commissioner to be allocable to receipts for dwellings constructed by the taxpayer on lots sold in a residential subdivision owned by him. The general facts upon which the additional assessment was based were stipulated by the parties on the hearing before the tax appeal court, as follows:

"Kenneth Kobayashi, the taxpayer, purchased the tract of land, subdivided the same, installed streets, utilities and other improvements. Thereafter, the taxpayer proceeded as follows: In a typical case, each of the lots was sold by a real estate realtor and an initial payment receipt and contract was executed by and between the taxpayer and the purchaser which is in Exhibit 3. Under the said contract, the taxpayer agreed to sell, the purchaser agreed to buy said piece of land together with a dwelling house chosen by the purchaser from among the model homes and some sketches exhibited and presented by the taxpayer. The agreed purchase price under said contract was for a total sum, without the allocation as to what amount was allocable to the land and what amount was allocable to the building chosen by the purchaser. The entire transaction was what was popularly known in real estate parlance as a 'package deal.' The purchaser's intent was to buy the land and the house; the seller's intent was to sell the land and the house so selected by the purchaser. It is also understood that the seller would not have sold the land separately. Secondly, with the execution of the contract, or very soon thereafter, the taxpayer and the purchaser entered into a building contract for the purpose of facilitating the financing of said transaction by the purchaser. Upon the approval by the lending institution, immediately prior to the closing of the loan, the taxpayer executed a deed for the full purchase price as is stipulated in the contract. Prior to the delivery of said deed, the

taxpayer secured revenue stamps for the full contract price. That is shown on the deed, Exhibit 5. The real estate commission to the realtor was based on the full contract price. Thereafter the taxpayer proceeded to and completed building in accordance with the model homes sketch selected by the purchaser. Those are the facts in the case. It represents a typical transaction of the taxpayer, Mr. Kobayashi."

The documentary evidence referred to in the stipulation of facts as a representative transaction pertained to a sale of a lot in the subdivision to Harold and Ethel Isa (hereinafter referred to as the "purchaser").

The original agreement between the taxpayer and the purchaser was executed on a standard Honolulu Realty Board printed form designated "Initial Payment Receipt and Contract." It acknowledged receipt by a realtor from the purchaser on January 14, 1956, of a $500.00 deposit as earnest money, and then set forth the contract between the parties. The contract (hereinafter referred to as the "initial contract") was dated January 14, 1956. It was filled in to provide that the taxpayer agreed to sell and the purchaser to buy: "Property located at Pearl City town tract land containing an area of 5117 sq. ft. more or less and to build 3 bedroom home according to specification & plan upon approval and further identified as Tax Map Key No. 9-7-34-7 for the purchase price of Fifteen Thousand Two Hundred and no/100 Dollars ($15,200.00) of which the Seller hereby acknowledges payment of the sum mentioned in the above Initial Deposit Receipt and the balance of which the Purchaser hereby promises to pay as follows: Down payment of $4900.00 including above initial deposit and balance subject to conventional loan." The second agreement between the parties is denominated "Building Contract." It was also dated January 14, 1956. By its terms the taxpayer agreed to con-

struct a three-bedroom dwelling on the lot covered by the initial contract according to attached plans and specifications, in consideration of the purchaser's promise to pay $10,300.00 in four equal installments the first of which was to be due when materials were delivered and work was started on the job. One of the remaining exhibits is a deed, dated February 1, 1956, conveying the lot to the purchaser for a recited consideration of $10.00 and other valuable consideration. The other exhibit is a mortgage of the lot, dated February 4, 1956, from the purchaser to a lending institution, securing the payment of the purchaser's note in the amount of $10,300.00.

The General Excise Tax Law, set out in Revised Laws of Hawaii 1955 as chapter 117, imposes a tax upon the privilege of doing business. The tax is applied to gross income at rates varying according to the occupation or activity of the taxpayer. For the purposes of the law, the term "contractor" is defined by § 117-7[1] to include "every person engaging in the business of contracting to erect, construct, repair or improve buildings or structures, of any kind or description." By § 117-14(c)(1) it is provided that "Upon every person engaging or continuing within the Territory in the business of contracting, the tax shall be equal to two and one-half per cent of the gross income of the business." Among other exemptions, § 117-3 provides that the words "gross income" shall not be construed to include receipts "from the sale of real property."[2]

The additional assessment was $4,835.67, computed at two and one-half per cent (the then prevailing rate) on $193,426.64, which is claimed by the deputy tax commis-

---

[1] All references herein to statutory provisions by section or chapter number only are to the Revised Laws of Hawaii 1955.

[2] This exemption was materially amended by Act 1, Sp. S. L. 1957, effective after the last tax year involved in this case.

sioner to be the aggregate amount of the receipts in the taxpayer's business allocable to proceeds for constructing the dwellings on the lots he sold in his subdivision during the years 1954, 1955, and 1956.

It is the taxpayer's position, sustained by the tax appeal court, that under the method employed in disposing of the lots in the subdivision "he sold the land together with the building selected by the purchaser from among the models or sketches exhibited and/or presented and, therefore, the entire purchase price was for the sale of real property and hence not taxable under Section 117-3, Revised Laws of Hawaii 1955."

The taxpayer has not contested the accuracy of the deputy tax commissioner's computation of the additional assessment. His appeal to the tax court was based only on the claim that the "receipts which are made the subject of the assessment arose out of the sale of real property." As presented and argued on this appeal the issue has been reduced to a determination of whether the entire $15,200 in the Isa transaction constituted consideration received for the sale of real property and was therefore exempt, as the taxpayer claims, or whether, as the deputy tax commissioner urges, $10,300 thereof was received by the taxpayer for constructing the building on the lot sold to the Isas and constituted income in the taxpayer's contracting business subject to the excise tax.

Appellee argues that the determination of the issue turns on whether the agreement he entered into with the purchaser is an indivisible or a divisible contract. He argues that the initial contract is the governing document and that, as the tax appeal court held, "the so-called building contract * * * was merely an additional paper which was used to implement the original deal."

The appellee is on firm ground in contending that the initial contract is an indivisible agreement. Its unap-

portioned consideration affords strong support for the contention as is indicated in the quotation given us from 12 Am. Jur., *Contracts*, § 317, p. 872, as follows: "The singleness or apportionability of the consideration appears to be the principal test. * * * If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items." We do not take singleness of consideration to be as conclusive as stated in the quoted portion of the text, but there appears to be no necessity of pursuing the point further since the issue is foreclosed by the stipulation that the taxpayer sold lots in his subdivision only on a "package deal" basis and that it was understood (by the parties to the sale) that the taxpayer would not have sold the land separately. "If the seller was unwilling to sell one portion without selling the whole, and the buyer unwilling to take a part unless he could have the whole, the contract in its nature is entire." 2 A.L.R. 646.

Although we agree with appellee's contention that the initial contract was indivisible, that fact, and whatever effect it might have had on the private relationship of the contracting parties *inter se,* were not and could not be binding on the taxing authority or determinative of the tax consequences flowing from the transaction resulting from the performance of the contract. "The private agreement of the parties was not binding on the assessor and the latter was under no obligation to make a separate assessment by reason of such agreement." *Oahu R. & L. Co. v. Ewa Plantation Co.,* 15 Haw. 318, 323. (See also *Davis et al. v. Taylor,* 194 Okl. 565, 153 P. 2d 231, 232; *W. T. Grant Co. v. McLaughlin,* 129 Conn. 663, 30 A. 2d 921, 922.)

We take it from the circumstances in evidence and argument of counsel that the plan followed in the sale of

lots and the construction of dwellings in the taxpayer's subdivision probably was designed with intent or hope of avoiding the imposition of the tax under consideration. We intend no implication that there was anything sinister in the plan adopted by appellee. It is unquestionably proper and within the rights of a taxpayer to minimize and avoid taxation by any means the law permits if the method adopted produces an actual change in the basic facts affecting liability to taxation. However, in determining tax liability it is fundamental that substance, rather than the form of the transaction, governs. 84 C.J.S., *Taxation*, § 62, p. 165; 51 Am. Jur., *Taxation*, § 10, p. 43. Actualities and consequences of a commercial transaction, rather than the method employed in doing business, are controlling factors in determining such liability. "The refinements or technicalities of contracts and conveyances are not the true diagnostics of the taxability of a transfer. It is more efficient to put in contrast on the one side the substance and practical effect of what was actually done, and on the other the import and design of the terms of the taxing statute." *Bank of New York* v. *Kelly*, 135 N. J. Eq. 418, 38 A. 2d 899, 901. "The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation." *Higgins* v. *Smith*, 308 U. S. 473, 477. See also *Knetsch* v. *United States*, ...... U. S. ......, ......, 81 S. Ct. 132, 135; *Boessow* v. *Johnson*, 10 Cal. App. 2d 578, 52 P. 2d 505, 508; *Collins* v. *Kentucky Tax Commission*, 261 S.W. 2d 303, 306 (Ky. App.); *Drobner* v. *Chapman*, 275 App. Div. 520, 90 N.Y.S. 2d 302, 304.

The initial contract did not in itself actually constitute a sale. Even as to the lot, it was merely an agreement to sell. *Southwestern Improvement Co.* v. *Whittington,* 193 So. 483, 486 (La. App.). The contract spells out quite clearly that the taxpayer agreed to do two separate and distinct things: (1) to convey the specified lot; and (2) to build a three-bedroom home on it. When the contract was executed on January 14, 1956, the building was non-existent. The same situation pertained when the deed was subsequently executed and delivered. Obviously, neither the model home nor any counterpart thereof was sold to the purchaser. "Any contract for an improvement of real estate by the erection upon, or the repair of a structure already upon it, presupposes use of materials. Materials that enter into such structure are tangible and before annexation to the realty are personal, not real, property." *Fifteenth Street Inv. Co.* v. *People,* 102 Colo. 571, 81 P. 2d 764, 767. Only the lot was, or could have been, conveyed by the deed. The sale of the lot was consummated by the delivery of the deed. *Pachter* v. *Gray,* 231 Ind. 487, 109 N.E. 2d 412, 414. At that time the contractor's obligation to build a dwelling still remained executory. As has been stated, the tax imposed by chapter 117 is on the privilege of doing business. It applies to the gross income of *"every person* engaging in the business of contracting to erect * * * buildings." There is no ambiguity in the provisions of the law applicable in this case. Tested by the criterion of "what was done" (*Knetsch* v. *United States, supra*), we think it would be wholly unrealistic to consider that the initial contract was a sale to the Isas of both a house and a lot. And to hold that the full consideration of $15,200 paid by the purchaser to the taxpayer was insulated from the general excise tax merely because the sale of the lot and the obligation to build a dwelling on it were tied together in a "package deal" would be to dis-

regard "the import and design of the terms of the taxing statute" (*Bank of New York* v. *Kelly, supra*) and to sanction an unwarranted avoidance of its intended scope. In our opinion the exemption under § 117-3 could apply only to the portion of the recited consideration properly allocable to the sales price of the lot. The remainder thereof constituted income received by the taxpayer for constructing the dwelling and was subject to the general excise tax at the contractor's two and one-half per cent rate.

The building contract fixed the price charged by the taxpayer for the construction of the dwelling at $10,300. In the absence of countervailing evidence, the price so established should be binding on the taxpayer. *In re Stamp Duty,* 10 Haw. 514, 517; *In re Taxes, Waiahole Water Co.,* 21 Haw. 679, 682. Consequently, of the total $15,200 received by the taxpayer in the particular transaction under consideration, $10,300 was subject to the general excise tax and only the balance thereof, or $4,900, was exempt therefrom as proceeds received from the sale of real property.

Since the issue has been argued and submitted on the basis of the tax consequences attending fulfillment of the agreement between the taxpayer and the Isas, and no question has been raised respecting the accuracy of the computation of the additional assessment made against the taxpayer for the years 1954, 1955, and 1956, it follows from our ruling respecting the Isa transaction that we must sustain the validity of the additional assessment.

Appellee also contends that the deputy tax commissioner has no statutory authority to appeal in this case and that we therefore have no jurisdiction other than to dismiss the appeal. Relying on § 116-16 read in light of the definition of "assessor" set out in § 115-1, it is contended that the government's right to a review in this

court of an adverse ruling of the tax appeal court is limited and restricted to an appeal taken by an "assessor."

Under § 116-16 it is provided: "Any taxpayer aggrieved or the assessor may appeal to the supreme court from the decision of the tax appeal court by filing a written notice of appeal * * *." It is provided by § 115-1 that: "Wherever used in chapters 115 to 131: 'assessor' or 'assistant assessor' means the assessor or an assistant assessor appointed for the taxation division concerned. Whenever there is more than one assessor for the first division, with respect to that division 'assessor' or 'assistant assessor' means the assessor or assistant assessor designated by the commissioner for a particular tax."

The basis of appellee's contention is summarized in one of the briefs filed on his behalf as follows: "The Deputy Tax Commissioner is not in any way an 'assessor' as defined under said Section 115-1. For the First Taxation Division, with which we are concerned, there are two assessors appointed pursuant to Section 115-1, to-wit, (1) an assessor for real property tax and (2) an assessor for income and miscellaneous taxes. J. A. Bell, at the time of the appeal, was a deputy tax commissioner for income and miscellaneous taxes but not an assessor for income and miscellaneous taxes."

*In re Chung's Appeal,* 44 Haw. 220, 352 P. 2d 846, and a number of other decisions of this court, are cited for the proposition that appeals are purely statutory and that, therefore, the right of appeal is limited as provided by the legislature and compliance with the method and procedure prescribed by it is obligatory. The general principle enunciated in the cases referred to is well established. In its application, the problem before us is to determine the procedure and limitations, if any, prescribed by the legislature for an appeal by the government from

the tax appeal court. The matter is purely one of ascertaining the legislative intent in that respect. And we think it is apparent that the issue can not be properly resolved by confining our consideration to §§ 116-16 and 115-1. There are other provisions in pari materia which must be considered. *Lord* v. *Lord,* 35 Haw. 843, 845; *Kamanu Et Als.* v. *E. E. Black, Ltd.,* 41 Haw. 442, 460; 82 C.J.S., *Statutes,* § 366, p. 801.

Prior to 1932, administration and enforcement of tax laws were under four assessors appointed, one for each tax division, by the Territorial Treasurer. Each assessor acted independently and was in complete charge of tax matters (personal, property, and income) in his particular division. (Chapters 102 and 103, R. L. H. 1925.) By Act 40, 2d Sp. S. L. 1932, the system of tax administration was completely revised. The act displaced the assessors as chief administrative officers and reduced them to subordinate capacity under a tax commissioner and deputy tax commissioners. The act gave the tax commissioner full power of supervision and the authority to perform any duty or function of any subordinate in the tax department. It vested the deputy commissioners with all powers of the commissioner in respect to matters within the scope of their duties. Act 79, S. L. 1945, further amended the law to provide for an assistant commissioner and to give that officer and the deputy commissioners the authority to also perform any act or function of a subordinate in their charge. Considered generally, the provisions of the law setting up this new system reflect a legislative intent and purpose to permit flexibility and promote efficiency in the administration and operation of the tax department through the establishment of a staff of supervisory officers having not only power to direct and control their own subordinates, but, also, within the scope of their respective commands, to perform, in person, any act necessary to the proper functioning of the department.

The general provisions applicable to and governing the administration of all taxes in the state are now included in chapter 115. By § 115-4(j) thereof, the tax commissioner is invested with the power: "Except where such construction would lead to absurdity or impossibility, to do or perform any act or duty which any subordinate of his is authorized or required to do or perform by chapters 115 to 131, and any such action so taken by the commissioner shall supersede action thereon by his subordinate." The section further provides that: "such power also shall pertain to the assistant commissioner and each deputy commissioner in respect of matters within the scope of his duties."

The General Excise Tax Law was enacted by Act 141, S. L. 1935. Its provisions, as has been stated, are set out in chapter 117. By § 117-9 thereof, it is provided that: "The commissioner of the Territory and the several deputy tax commissioners, divisional assessors, assistant assessors and other assistants, and tax collectors, appointed by the commissioner, shall have, in addition to all of the duties and powers herein respectively prescribed or granted, all the duties and powers respectively prescribed or granted by the existing or future tax laws of the Territory so far as the same may be applicable to the administration of this chapter and are not contrary to the express provisions hereof." The intended effect of this provision is to make applicable to the administration of the General Excise Tax Law all of the provisions of chapter 115 including those of § 115-4(j). And since § 115-4(j) gives the commissioner the right "to do or perform any act or duty which any subordinate of his is authorized or required to do or perform by chapters 115 to 131," it is clear that the tax commissioner is invested with the authority to directly exercise the right of appeal given his subordinate "assessor" by § 116-16.

The tax commissioner is given the power by § 115-4(a) to appoint an assistant commissioner, deputy commissioners, one or more assessors for the first division, and one assessor for each other division, who "shall have all of the powers of the commissioner in respect of matters within the scope of their duties."

From the record herein it appears that the appellant made the additional assessment involved in this case. His authority in that respect has not been questioned. As is seen from the quotation from the appellee's brief above made, the appellant is a deputy tax commissioner in the first taxation division for income and miscellaneous taxes, or, in other words, for all but real property taxes. The matter of the enforcement of the assessment before us was therefore within the scope of the appellant's duties. Since by virtue of the provisions of § 115-4(a) appellant had all of the powers of the commissioner in respect to the enforcement of such assessment, in our opinion he had the same authority to appeal from the ruling of the tax appeal court that the tax commissioner could have directly exercised in this case.

Upholding, as we do, the deputy commissioner's right to appeal on the above-stated basis, there is no necessity of our ruling on additional grounds urged by appellant to support the regularity of his appeal.

In accordance with the foregoing, it is our conclusion that we have jurisdiction of this appeal and that the additional assessment of general excise taxes made against the taxpayer for the years 1954, 1955, and 1956, should be sustained. The ruling of the tax appeal court is therefore reversed.

*Shiro Kashiwa,* Attorney General, and *Ronald B. Greig,* Deputy Attorney General, for appellant.

*Yasutaka Fukushima* for appellee.