**COLORADO CARPET INSTALLATION, INC., d/b/a Sierra Range Carpets, Inc., a Colorado corporation, Petitioner,**

v.

**Fred PALERMO and Zuma Palermo, Respondents.**

**No. 82SC168.**

Supreme Court of Colorado.

Sept. 12, 1983.

Louis A. Weltzer, Denver, for petitioner.

Joseph P. Constantine, Denver, for respondents.

QUINN, Justice.

We granted certiorari to review the decision of the court of appeals in *Colorado Carpet Installation, Inc. v. Palermo,* 647 P.2d 686 (Colo.App.1982). The court of appeals, in reversing the trial court, held that an oral agreement involving the purchase and installation of carpeting and other flooring materials was a contract for the sale of goods within the meaning of section 4–2–201(1), C.R.S.1973, of the Uniform Commercial Code, rather than a service contract, and that the contract was unenforceable because the goods did not qualify under section 4–2–201(3)(a), C.R.S.1973, for the "specially manufactured goods" exception to the "writing" requirement of section 4–2–201(1), C.R.S.1973. We affirm the judgment of the court of appeals.

## I.

In July 1980 Colorado Carpet Installation, Inc., doing business as Sierra Range Carpets, Inc. (Colorado Carpet), commenced an action in the District Court of Adams County against Fred and Zuma Palermo for breach of contract. The claim was based on an alleged oral agreement in which the Palermos agreed to pay $4,775.75 to Colorado Carpet for the purchase and installation of carpeting, other flooring materials, and bathroom tile for the Palermo home in Thornton, Colorado. The Palermos in their answer denied the existence of a contract and affirmatively asserted that the statute of frauds, section 4–2–201(1), C.R.S.1973, rendered any such agreement unenforceable.

The controversy was tried to the court and arose as follows. Colorado Carpet is a Colorado corporation engaged in the business of selling and installing carpeting, tile and other flooring materials. In April 1980,

Jack Duran, the president of Colorado Carpet, began negotiations with the Palermos for the sale and installation of carpeting, carpet padding, tile and vinyl floor covering in the downstairs and upstairs areas of their home. Colorado Carpet did not maintain an actual retail store or warehouse for these materials, but arranged to purchase them from other distributors. In the course of his negotiations with the Palermos, Duran delivered carpet samples to the Palermo home, measured the home, and assisted Mrs. Palermo in locating at local retail outlets the type and brand of flooring materials that she wanted. Further negotiations ensued, including a written proposal from Duran.

This written proposal, which referred to Colorado Carpet as "the seller" and to the Palermos as "the customer," stated that Colorado Carpet offered for the Palermos' acceptance the following items: a total of 195 square yards of Seduction and Amaretto carpeting, along with padding, at $15.95 per square yard, for a total price of $3110.45; 48 square yards of kitchen carpeting at $8.50 per square yard, for a total price of $399.50;[1] 55 square yards of deck carpeting at $7.50 per square yard, for a total price of $412.50; approximately 220 square feet of ceramic tile at $3.50 per square foot, for a total price of $770; and 9 square yards of vinyl floor covering at $9.50 per square yard, for a total price of $85.50. The proposal expressly included all labor. According to Duran, the source of Colorado Carpet's profit from such a transaction would be the markup on the sale of the materials and not their installation, the latter being provided at cost. He estimated the labor cost at $2.00 per square yard for installing the upstairs, downstairs and kitchen carpeting, and $1.50 per square foot for installing the tile.

Although the Palermos never made a written acceptance of Colorado Carpet's proposal, Duran testified that Mrs. Palermo orally accepted the proposal on or about April 25, 1980, shortly after he submitted it to her. Mrs. Palermo, in contrast, denied accepting the written proposal. It was her testimony that neither she nor her husband ever agreed to purchase any carpeting from Colorado Carpet and that she had contacted Duran only about a tiling job for the upstairs and downstairs bathrooms.

On April 30 and May 1, 1980, Colorado Carpet placed orders with Georgia and California manufacturers for the Seduction (downstairs) and the Amaretto (upstairs) carpeting. These orders called for both carpets to be cut into segments measuring 12 feet by 73 feet in order to permit effective installation in the upstairs and downstairs sections of the Palermo home.[2] The orders were filled in due course, and the carpets were eventually delivered to a Denver warehouse. Colorado Carpet deferred ordering the carpet padding and kitchen carpet at this time because these were stock items and could be purchased immediately before the installation was to commence.

Colorado Carpet purchased and delivered the ceramic tile to the Palermo home for eventual installation in the upstairs and downstairs bathrooms. Mrs. Palermo, however, had a disagreement with Colorado Carpet's tile man over some repair work in connection with the tile installation and arranged with some other contractor to supply and install other tile. Duran, on behalf of Colorado Carpet, attempted unsuccessfully to renegotiate with the Palermos but to no avail. Colorado Carpet removed its tile from the home, returned half of it to the supplier for a refund and sold the other half. It also shipped the Seduction carpeting back to the California manufacturer in

1. At $8.50 per square yard, the price of 48 square yards of kitchen carpeting should have been $408.

2. Colorado Carpet paid a more expensive "cut price" rather than the usual "roll price" for the orders. Mr. Duran testified that an order based on the "roll price" would be cut from that size of available roll that most nearly approximates the dimensions requested in the cut. The "special cut" price, in contrast, is based upon an order cut to the dimensions requested.

exchange for some credit and was able to sell the Amaretto carpeting to a local purchaser.

The trial court found that Colorado Carpet's proposal for the sale and installation of the carpeting and other materials had been orally accepted by the Palermos, thereby resulting in a contract, and determined that the contract was enforceable for two reasons: first, the agreement constituted a service contract for the performance of labor, rather than a contract for the sale of goods, and thus was not subject to the "writing" requirement of the statute of frauds section of the Uniform Commercial Code, section 4–2–201(1), C.R.S.1973; and second, even if the entire agreement was construed as a contract for the sale of goods, that part of the agreement relating to the purchase and installation of carpeting fell within the "specially manufactured goods" exception to the statute of frauds, section 4–2–201(3)(a), C.R.S.1973, and thus was enforceable on that basis.[3] The court awarded damages to Colorado Carpet in the amount of $1,356.50, based upon lost profits, labor, and storage and shipping costs in connection with all the carpeting and padding ordered under the contract, not just the upstairs and downstairs carpeting. The court of appeals reversed the judgment, reasoning that although the agreement was a contract for the sale of goods, it did not satisfy the "specially manufactured goods" exception to the statute of frauds. We granted certiorari to consider whether the oral agreement in question constituted a contract for the sale of goods within the meaning of section 4–2–201(1) of the Uniform Commercial Code, and, if so, whether it qualified for the "specially manufactured goods" exception of section 4–2–201(3)(a).

## II.

We first address the court of appeals' determination that the contract was one for the sale of goods, rather than for the performance of labor or services. We conclude that the agreement in question involved a contract for the sale of goods as contemplated by section 4–2–201(1), C.R.S.1973.

This section prohibits the enforcement of contracts "for the sale of goods for the price of $500 or more . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . ." By its terms, the statute applies only to contracts for the sale of goods, and not to contracts for labor or services. *E.g., Robertson v. Ceola,* 225 Ark. 703, 501 S.W.2d 764 (1973); *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.,* 12 Ill.App.3d 362, 299 N.E.2d 601 (1973); 3 R. Duesenberg & L. King, *Bender's Uniform Commercial Code Service* § 2.02[4] at 2–24 (1982); *cf. Samuelson v. Chutich,* 187 Colo. 155, 529 P.2d 631 (1974) (statutory warranties imposed by Uniform Sales Act not applicable to *service*

---

**3.** The trial court also concluded that the entire oral agreement was excepted from the statute of frauds by reason of the doctrine of part performance. Section 4–2–201(3)(c), C.R.S. 1973, states that a contract not satisfying the "writing" requirement of section 4–2–201(1), C.R.S.1973, is nevertheless enforceable "[w]ith respect to goods for which payment has been made and accepted or which have been received and accepted (section 4–2–606)." Official Comment 2 to section 4–2–201 states that " '[p]artial performance' as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted." The only material actually received and accepted was the tile, but Colorado Carpet, as the trial court found, was able to return or resell the tile and suffered no damages on this item. The court of appeals resolved the part performance issue as follows:

"Here, the tile was the only item which was delivered to and initially accepted by the defendants. However, plaintiff removed the tile, and payment for the tile forms no part of plaintiff's present claim. As the carpeting was neither received nor accepted by the defendant, the part performance exception cannot apply to validate that portion of the contract." 647 P.2d at 688.

Colorado Carpet has not requested certiorari review on the part performance issue, and we do not address it in this opinion.

contracts). The Uniform Commercial Code defines "goods" to mean "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action." Section 4–2–105(1), C.R.S.1973. A "sale," by statutory definition, "consists in the passing of title from the seller to the buyer for a price," and a "contract for sale" includes a present sale of goods as well as a contract to sell goods at a future time. *Id.* 4–2–106(1).

■ In this case the subject of the contract involved "goods" because the carpeting and other materials were movable at the time that Colorado Carpet procured them for installation pursuant to the agreement. Since the agreement contemplated that title to the carpeting and other materials would pass to the Palermos, it constituted a "contract for sale." The scope of the contract, however, included not only the sale of goods but also the performance of labor or service. Thus, we must determine whether such a mixed contract qualified as a contract for the sale of goods or, instead, constituted a contract for labor or service outside the scope of section 4–2–201(1), C.R.S.1973.

The performance of some labor or service frequently plays a role in sales transactions. "Goods," however, are not the less "goods" merely because labor or service may be essential to their ultimate use by the purchaser. The mere furnishing of some labor or service, in our view, should not determine the ultimate character of a contract for purposes of section 4–2–201(1) of the Uniform Commercial Code. Rather, the controlling criterion should be the primary purpose of the contract—that is, whether the circumstances underlying the formation of the agreement and the performance reasonably expected of the parties demonstrates the primary purpose of the contract as the sale of goods or, in contrast, the sale of labor or service. We agree in this re-

spect with the following statement in *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir. 1974):

> "The test for inclusion or exclusion is not whether [goods and services] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.,* insulation of a water heater in a bathroom)."

*Accord, e.g., Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599 (1979); *Burton v. Artery Co., Inc.,* 279 Md. 94, 367 A.2d 935 (1977); *Meyers v. Henderson Construction Co.,* 147 N.J.Super. 77, 370 A.2d 547 (1977). *See generally* Annot., *Applicability of U.C.C. Article 2 to Mixed Contracts for Sale of Goods and Services,* 5 A.L.R. 4th 501 (1981).

This "primary purpose" test, we believe, is designed to promote one of the expressed statutory policies of the Uniform Commercial Code—"[t]o simplify, clarify, and modernize the law governing commercial transactions." Section 4–1–102(2)(a), C.R.S.1973. Useful factors to consider in determining whether "goods" or "service" predominates include the following: the contractual language used by the parties, *see, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737 (2d Cir.1979); *Bonebrake v. Cox, supra; Fifteenth Street Investment Co. v. People,* 102 Colo. 571, 81 P.2d 764 (1938); whether the agreement involves one overall price that includes both goods and labor or, instead, calls for separate and discrete billings for goods on the one hand and labor on the other, *see, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc., supra; Aluminum Company of America v. Electro Flo Corp.,* 451 F.2d 1115 (10th Cir.1971); the ratio that the cost of goods bears to the overall contract price, *see, e.g., Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262 (D.Me.1977); *Van Sistine v.*

*Tollard,* 95 Wis.2d 678, 291 N.W.2d 636 (Wis.Ct.App.1980); and the nature and reasonableness of the purchaser's contractual expectations of acquiring a property interest in goods (goods being defined as things that are movable at the time of identification to the contract, section 4–2–105(1), C.R. S.1973), *see generally* Marshall, *The Applicability of the Uniform Commercial Code to Construction Contracts,* 28 Emory L.J. 335, 365–76 (1979).

Considering the contract under these guidelines, we are satisfied that, as a matter of law, its primary purpose was the sale of goods and not the sale of labor or service.[4] The language in Colorado Carpet's proposal referred to the parties as "seller" and "customer." In addition, the agreement called for an overall contract price that included both the cost of goods and labor, and, as the trial evidence established, the charge for labor was slight in relation to the total contractual price.[5] Finally, the carpeting and other materials were movable when Colorado Carpet procured them for the purpose of selling them to the Palermos. The fact that these materials might later be installed in the Palermo home and assume the character of fixtures does not undermine the primary purpose of the contract as one for a sale of goods. *See Saliba v. Reed Electric Co.,* 90 Colo. 287, 8 P.2d 1095 (1932). We therefore agree with the court of appeals that the agreement between Colorado Carpet and the Palermos constituted a contract for the sale of goods, with labor or service only incidentally involved, and thus within the statute of frauds provisions of the Uniform Commercial Code.

### III.

We turn now to the question whether the contract qualified for the "specially manufactured goods" exception to the statute of frauds. Section 4–2–201(3)(a), C.R.S.1973, states that a contract for the sale of goods which does not meet the "writing" requirements of section 4–2–201(1), C.R.S.1973, is nonetheless enforceable under the following circumstances:

"If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement ...."

The plain terms of section 4–2–201(3)(a), C.R.S.1973, make clear that four distinct criteria are necessary to satisfy the "specially manufactured goods" exception to the statute of frauds: (1) the goods must be specially made for the buyer; (2) the goods must be unsuitable for sale to others in the ordinary course of the seller's business; (3) the seller must have substantially begun to have manufactured the goods or to have made a commitment for their procurement; and (4) the manufacture or commitment must have been commenced under circumstances reasonably indicating that the goods are for the buyer and prior to the seller's receipt of notification of contractual repudiation. In this case there is no dispute that the third and fourth statutory criteria have been established. There is evidence

4. While some cases have concluded that certain installation agreements involving flooring materials are service contracts, we find them distinguishable from the instant case. *See, e.g., Ranger Construction Co. v. Dixie Floor Co., Inc.,* 433 F.Supp. 442 (D.S.C.1977) (emphasizing that the agreement was a "construction contract" and not a contract for the sale of goods, one party being referred to as a "subcontractor" rather than a "materialman"); *Dionne v. Columbus Mills, Inc.,* 311 So.2d 681 (Fla.Dist.Ct.App.1975) (installer provided all

materials except the carpet itself which was furnished by the hiring party).

5. At the rate of $2.00 per square yard as the labor charge for installation of the upstairs, downstairs and kitchen carpets, and $1.50 per square foot for installation of the tile, the contract price of $4,777.75 represents a total labor charge of $926 ($596 for 298 square yards of carpeting and $330 for 220 square feet of tile). The record contains no evidence of a labor charge for installation of the vinyl floor covering.

demonstrating that Colorado Carpet, before receipt of the Palermos' repudiation of the agreement and under circumstances reasonably indicating that the upstairs and downstairs carpeting was for them, placed special orders with carpet manufacturers for the procurement of these two pieces of carpeting. There being no controversy about these matters, we confine our consideration to the statutory provisions requiring the goods to be "specially manufactured for the buyer" and "not suitable for sale to others in the ordinary course of the seller's business."

### A.

The "specially manufactured goods" exception is premised on notions of both evidentiary reliability and fairness. Certain marketing practices provide sufficiently reliable evidence on the matter of a contractual relationship as to dispense with the written requirements of the statute of frauds. It is a reasonable assumption, for example, that a seller will not make or procure goods not suitable for sale to others in the normal course of the seller's business unless a purchaser has contracted with the seller to purchase these goods. *See Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026 (5th Cir.1982); 3 R. Duesenberg & L. King, *supra,* § 2.02[4] at 2–30. Denying enforcement of the contract under such circumstances can result in unfairness to the seller by encumbering him with unsalable goods. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d at 1037. There is no unfairness in nonenforcement, however, when the goods are of a class customarily sold by the seller and are readily marketable to others in the ordinary course of the seller's business.

■ The term "specially manufactured" refers to the character of the goods as specially made *for a particular buyer,* and not to whether they were "specially made" in the usual course of the seller's business.

*Id.* Thus, although not articulated in the Uniform Commercial Code, "the unsalable quality of the goods presumably must be found in their characteristics of special manufacture and not in such tests as lost markets, passed seasons, or the objective inability of the particular seller to dispose of the goods for reasons unrelated to their nature as prescribed by the buyer." 2 R. Duesenberg & L. King, *supra,* § 2.02[4] at 2–32. It has been held that "[i]f with slight alterations the goods could be sold, then they are not specially manufactured; if, however, essential changes are necessary to render the goods marketable by the seller to others, then the exception does apply." *Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d at 1037. It is in the light of these standards that the evidentiary state of the record must be considered.

### B.

■ There is no evidence from which one may reasonably conclude that the upstairs and downstairs carpets were "specially made" within the intendment of section 4–2–201(3)(a), C.R.S.1973. These styles of carpets had been observed by Mrs. Palermo in retail carpeting outlets in the Denver area, and both carpets were ordered by Colorado Carpet as stock items from carpet manufacturers in California and Georgia. No special dying, weaving or other treatment was required to fill the orders. The carpeting was not cut to any unusual shape nor even to the precise dimensions of the rooms where they were to be installed, but rather was cut in a rectangular shape with footage adequate for the entire project. In short, there is no showing of any unusual or special features of the carpeting that might attest to its character as specially made for a particular buyer. *See, e.g., Maderas Tropicales v. Southern Crate & Veneer Co.,* 588 F.2d 971 (5th Cir.1979); *Saliba v. Reed Electric Co., supra.*

The record is similarly deficient in establishing that the upstairs and downstairs car-

peting satisfied the other statutory requirement of section 4–2–201(3)(a), C.R.S.1973: "not suitable for sale to others in the ordinary course of the seller's business." The business of Colorado Carpet was to purchase carpeting from wholesalers or manufacturers and then to resell the carpeting to retail purchasers at a price inclusive of a labor charge for installation. As a dealer in carpeting and other flooring materials, Colorado Carpet continually dealt with goods of this nature and reasonably could be expected to find a buyer for them. There certainly was nothing in the character of the upstairs and downstairs carpeting that required basic or essential changes to be made in order to render them marketable to other purchasers. The dimensions of both pieces of carpeting were such that each could be easily recut, if necessary, to accommodate retail purchasers who might be looking for these particular brands in different dimensions. Indeed, the record shows that Colorado Carpet received credit from the manufacturer upon its return of the upstairs carpet and had little difficulty in selling the downstairs carpet to a local purchaser. This state of the record is manifestly insufficient to support the trial court's determination that the upstairs and downstairs carpeting qualified for the "specially manufactured goods" exception to the statute of frauds.

We also conclude that there was no evidence to support the trial court's inclusion of the carpet padding and the kitchen carpet in the "specially manufactured goods" category. The record shows that these materials were stock items, and, far from being cut or processed to conform to the needs of the customer, they were never ordered or obtained by Colorado Carpet in connection with the Palermo agreement.[6]

It was the burden of Colorado Carpet to present sufficient evidence permitting the fact finder to reasonably conclude by a preponderance of the evidence that the goods included in its sales agreement with the Palermos satisfied the statutory criteria for the "specially manufactured goods" exception to the statute of frauds. It failed to carry its burden of proof on this issue, and, as the court of appeals correctly ruled, the trial court erred in enforcing the contract.

The judgment of the court of appeals is affirmed.

---

**6.** Mr. Duran testified that he usually ordered kitchen carpets C.O.D. and the cutting would take place when the supplier was actually paid. Since the kitchen carpets had been neither ordered nor paid for, they obviously had not been cut for installation in the Palermo home.