129 P.3d 528

**In the Matter of the TAX APPEAL OF SUBWAY REAL ESTATE CORP., Taxpayer–Appellee/Cross–Appellant**

v.

**DIRECTOR OF TAXATION, STATE OF HAWAI'I, Appellant/Cross–Appellee.**

No. 26488.

Supreme Court of Hawai'i.

Feb. 28, 2006.

Hugh R. Jones and Damien A. Elefante, Deputy Attorneys General, State of Hawai'i, on the briefs, for appellant/cross-appellee.

Miki Okumura, Lindalee K. Farm, and Donna H. Kalama (Goodsill Anderson Quinn & Stifel), Honolulu, on the briefs, for taxpayer-appellee/cross-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold in this appeal by Appellant–Cross–Appellee Director of Taxation, State of Hawai'i (the Director) from the March 9, 2004 final judgment of the Tax Appeal Court (the court) [1] that (1) the rule of strict construction of statutes does not apply in this case to Hawai'i Revised Statutes (HRS) § 237–2 (2001 Repl.); [2] (2) the Director's assessment of Hawai'i general excise taxes (GET) on the subleasing activities of Taxpayer–Appellee–Cross Appellant Subway Real Estate Corp. (Taxpayer) was proper inasmuch as (a) Taxpayer gained or economically benefitted under HRS § 237–2 from said activities, and (b) the substance-over-form doctrine enunciated in *In re Tax Appeal of Hawaiian Tel. Co.*, 57 Haw. 477, 559 P.2d 283 (1977), does not apply to the present case; and (3) the reimbursement provisions of HRS § 237–20 (2001 Repl.) [3] do not apply to the present case. Because the court ruled to the contrary as to Taxpayer's GET liability for its subleasing activities, we vacate the court's March 9, 2004 final judgment, and remand with instructions to enter judgment in favor of the Director. With regard to Taxpayer's cross-appeal, we hold the record is insufficient to resolve Taxpayer's GET lia-

---

1. The Honorable Gary W.B. Chang presided.

2. The text of Hawai'i Revised Statutes (HRS) § 237–2 (2001 Repl.) is reproduced *infra*.

3. The relevant provisions of HRS § 237–20 (2001 Repl.) are reproduced *infra*.

bility for services. Therefore we also remand to the court for a determination of Taxpayer's GET liability, if any, for services.

## I.

### A.

Doctor's Associates, Inc. (DAI) is the franchisor of Subway Sandwich shops throughout the United States. According to Taxpayer, Franchise Real Estate Leasing Corporation (FRELC), is an "affiliate" of DAI, and negotiates the master leases and subleases for the locations of the Subway shops on behalf of DAI, the prospective franchisees, and two other companies, Subway Restaurants, Inc. and Subway Sandwich Shops Inc., both nominal holders of certain leases and subleases. Taxpayer, a Delaware corporation, states that, as an affiliate of DAI and a wholly-owned subsidiary of FRELC, it is responsible for signing and maintaining the leases and subleases for each Subway Sandwich shop in the United States. As of December 31, 1991, thirty-nine Subway Sandwich shops were in operation in Hawai'i.

In its Franchise Offering Circular (circular) DAI lists Taxpayer as a corporation that may act as a sublessor of restaurant premises, states that Taxpayer is empowered to terminate the subleases and to require the franchisee to vacate the premises through legal action, and may be involved in litigation in various jurisdictions with respect to certain leases and subleases. In order to establish a Subway Sandwich shop, a franchisee must sign the "Franchise Agreement" (the agreement) with DAI. The pertinent provisions in the agreement relating to Taxpayer's subleasing activities (1) oblige the franchisee to sublease property from Taxpayer; (2) permit Taxpayer to charge the franchisee a higher rent for portions of the property that are not used as a Subway Sandwich shop; and (3) direct the franchisee to indemnify Taxpayer for acts of negligence or fault.

Taxpayer directly leases real property from a landlord through a master lease agreement (lease agreement). Taxpayer then subleases the real property through a sublease agreement to a franchisee to establish a shop. Under the sublease agreement, all sublease rent is paid directly by the franchisee to the landlord rather than to Taxpayer. Section twenty-eight of the lease agreement, entitled "Limitation of Liability of Persons and Entities Affiliated With Tenant," stated that "Landlord recognizes and acknowledges that the [Taxpayer] is a Delaware corporation and that [Taxpayer's] assets consist almost exclusively of leases, subleases, and options to purchase leased premises." Although Taxpayer states that FRELC is responsible for negotiating the leases and subleases, the lease agreement provides that Taxpayer was in the business of "negotiating and drafting leases with a view towards subletting the leased premises to franchisees [or] licensees of [DAI]." (Boldfaced font omitted.)

### B.

On November 28, 1998, pursuant to HRS § 237–13(10),[4] the Director assessed Taxpayer for GET, interest, and penalties in the total amount of $26,805.47 as unreported income arising from Taxpayer's 1992 subleasing activity. According to the Director, the amount assessed was based on four percent of the "gross income" at the rate indicated in the leases and subleases. Taxpayer appealed the assessment to the Board of Review, First Taxation District (Board of Review).

On January 14, 1999, the Board of Review upheld that tax assessment in the amount of $23,092.80 and waived the penalty of $3,712.67. On February 2, 2000, Taxpayer appealed the Board of Review's decision to the court.

On August 10, 2000, Taxpayer moved for summary judgment, arguing that its subleasing activity in Hawai'i was not subject to the GET because (1) there was no object of gain

4. Former HRS § 237–13(10) (Supp.1998) (now HRS § 237–13(9) (Supp.2005)), authorizes the State to impose a four-percent (4%) general excise tax (GET) on persons "engaging or continuing within the State in any business, trade, activi- ty, occupation, or calling" and not subject to special assessment provisions under HRS chapter 237. The current version of HRS § 237–13(9) retains the same language.

or economic benefit; (2) it did not receive any fee or other consideration; and (3) Taxpayer's primary purpose was to sign leases and subleases for all franchise properties in the United States and nothing else. Alternately, Taxpayer argued, if it was engaged in a business activity subject to the GET, the gross receipts were exempt under HRS § 237–20.[5]

On the same date, the Director moved for summary judgment asserting that Taxpayer's subleasing activity is subject to the GET under HRS §§ 237–13 and 237–2.[6]

On August 28, 2000, during the hearing on the motions for summary judgment, the court indicated that the GET should have been assessed based on the value of services instead of the value of the lease rent amounts.

On October 12, 2000, the court entered two orders. One order granted in part and denied in part the Director's motion for summary judgment as follows:

(1) [T]he Director's Motion for Summary Judgment is GRANTED IN PART with respect to the Director's power to assess [GET] against Taxpayer based upon the value of any services that Taxpayer provided . . .; and (2) the Director's Motion for Summary Judgment is DENIED IN PART with respect to the Director's assessment of [GET] against Taxpayer based upon the sublease income.

(Some capitalization omitted.) The other order granted in part and denied in part Taxpayer's motion for summary judgment:

(1) [Taxpayer's] Motion for Summary Judgment is granted in part, to the extent that the [Director's] assessment of [GET] based upon the sublease income was not proper, and (2) [Taxpayer's] Motion for Summary Judgment is denied in part, to the extent that . . . the [Director] has the

power to assess [GET] against [Taxpayer] based upon the value of services, if any, provided by [Taxpayer].

On October 23, 2000, the Director moved for reconsideration of the court's two orders issued on October 12, 2000.

On April 25, 2001, Taxpayer moved for summary judgment arguing that under *In re C. Brewer,* 65 Haw. 240, 649 P.2d 1155 (1982), the value of any services provided was no more than $6875.00 and not taxable because the services were performed outside of Hawai'i. The Director opposed the motion, arguing that the facts and evidence did not support Taxpayer's position on the value of services provided and the location of the services performed.

On November 8, 2001, the parties entered into and filed a stipulation. The pertinent parts of the stipulation state as follows:

[F]or the purpose of agreeing on factual issues that remain in controversy, [the parties] stipulate as follows:

1. On October 12, 2000, this [c]ourt entered its Order Granting in Part and Denying in Part [Taxpayer's] Motion for Summary Judgment Filed August 10, 2000 and its Order Granting in Part and Denying in Part [Director's] Motion for Summary Judgment, both of which provide that the Director's assessment of [GET] based upon sublease income was not proper, but that the Director has the power to assess [GET] against [Taxpayer] based upon the value of services, if any, provided by [Taxpayer] pursuant to the Hawaii Supreme Court's decision in [*In re C. Brewer*];

2. At a hearing held on September 24, 2001, this [c]ourt denied [Taxpayer's] Motion for Summary Judgment Filed April 25, 2001, on the basis that the proper

---

5. In relevant part, HRS § 237–20 states that "[t]he reimbursement of costs or advances *made for or on behalf of one person by another* shall not constitute gross income of the latter, *unless the person receiving such reimbursement also receives additional monetary consideration for making such costs or advances.*" (Emphases added.)

6. HRS § 237–2 defines the term "business" to include "*all activities* (personal, professional, or

corporate), *engaged in or caused to be engaged in with the object of gain or economic benefit either direct or indirect,* but does not include casual sales." (Emphases added.) Furthermore, the term "engaging," as used in HRS chapter 237, "with reference to engaging or continuing in business[,] also includes the exercise of corporate or franchise powers." *Id.*

measure of the value of services provided by [Taxpayer] pursuant to the *Brewer* case might by an issue remaining in dispute. An Order has been lodged with this [c]ourt.

3. For purposes of [Taxpayer's] 1992 tax year, and that tax year alone, [Taxpayer] and the Director stipulate that the value accruing from any benefit conferred by [Taxpayer] on [DAI] was $10,875, although no cost consideration therefore [sic] was received by [Taxpayer].

4. *[Taxpayer] does not admit or concede that any services* or benefit *accruing to DAI were provided or performed by [Taxpayer] within the State of Hawaii.*

5. *This stipulation is not an admission or concession by the Director that the lease rent paid by DAI's franchisees to the landlord* under any master lease agreement executed by [Taxpayer] as the lessee in 1992 *was not subject to [GET] as gross income to [Taxpayer], nor an admission or concession by [Taxpayer] that [Taxpayer] earned or otherwise received any rental income taxable to [Taxpayer].*

(Emphases added.)

On November 27, 2001, the court denied Taxpayer's motion for summary judgment filed April 25, 2001. On the same date, the court denied the Director's motion for reconsideration filed October 23, 2000.

On December 7, 2001, Taxpayer moved for reconsideration of the order denying its motion for summary judgment, arguing that there was no genuine issue of fact in light of the stipulation.

On March 9, 2004, the court granted Taxpayer's motion for reconsideration, stating that "[a]ny services provided by any affiliate of [Taxpayer] are attributable to [Taxpayer]." The court stated that "[f]or the tax year 1992, [Taxpayer] is liable for [GET] in the amount of $435.00. [Taxpayer] is entitled to a refund in the amount of $26,370.47, plus interest thereon as provided by law."

On April 1, 2004, the Director filed its appeal and on April 13, 2004, Taxpayer filed its cross-appeal.

## II.

On appeal, the Director contends that (1) the business of subleasing is subject to the GET and that (2) the facts on record show that (a) Taxpayer was engaged in a business activity subject to the GET inasmuch as the activity in question resulted in gain or economic benefit; (b) in substance, Taxpayer's business activity is subject to the GET; and (c) any gross receipts from rental income are not exempt from the GET under HRS § 237–20.

In its answer, Taxpayer does not dispute that the business of subleasing is subject to the GET. However, Taxpayer asserts that (1) it was not engaged in a taxable business activity inasmuch as (a) HRS § 237–2 must be strictly construed against the Tax Department and (b) the subleasing arrangement was not done with "the object of gain or economic benefit[,]"; (2) the substance-over-form doctrine applies in its favor because (a) in substance, the subleases were security instruments for DAI and (b) its GET liability should be based on the substance, rather than the form, of DAI's franchise arrangement; (3) if Taxpayer is deemed to be engaged in a business activity, any gross receipts are exempt under the reimbursement provisions of HRS § 237–20 because (a) its transaction satisfied the Tax Department's requirements for treatment as a nontaxable reimbursement, (b) if it constructively received the rent, which the Tax Department attributes to Taxpayer, it should be treated as a reimbursable cost, and (c) Taxpayer's position is supported by recently issued proposed reimbursement rules.

In reply, the Director (1) urges this court to disregard Taxpayer's argument that HRS § 237–2 should be strictly construed against the Director because this argument was never presented to the court, and that Taxpayer fails to recognize the essential elements for the application of the doctrine of strict construction of a taxing statute, (2) reasserts that Taxpayer's leasing activity is a business pursuant to HRS § 237–2, (3) argues that Taxpayer receives income subject to the GET, (4) maintains that the sublease agreements are not a security interest for DAI, and (5) contends that the reimbursement ex-

emption under HRS § 237–20 is not applicable since (a) HRS § 237–20 never encompassed subleasing and (b) Taxpayer does not satisfy the provisions of HRS § 237–20 because it never reimbursed any cost or made an advance for or on behalf of a party, and did not receive a reimbursement of a cost or advance from anyone. Accordingly, the Director requests that this court reverse the order and judgment entered by the court and uphold its assessment of GET, as modified by the Board of Review, against Taxpayer's subleasing activities in the amount of $23,092.80.

In its cross-appeal, Taxpayer argues that the court erred (1) in concluding that it was engaged in a taxable business activity for the services rendered by FRELC and (2) in finding Taxpayer liable for GET in the amount of $435.00 because the services, if any, were rendered by FRELC and were totally performed outside of Hawai'i inasmuch as (a) the plain language of HRS § 237–13 limits the taxing power of the Tax Department to activities within the state and (b) the apportionment rules limit the imposition of taxes on services to those performed within the state. Taxpayer requests that this court reverse the court's decision to the extent that it concluded that Taxpayer had any GET liability.

In its answer, the Director contends that Taxpayer was engaged in a taxable business activity for the services rendered by FRELC and that the broad scope of the GET laws permit the imposition of virtually all business activity in Hawai'i unless specifically exempted, and in this case, the GET laws encompassed Taxpayer's business.

### III.

■ The standards of review applicable to this case are correctly set forth by both parties. The grant or denial of a motion for summary judgment is reviewed on appeal *de novo* under the same standards applied by the trial court. *In re Tax Appeal of Baker & Taylor, Inc. v. Kawafuchi,* 103 Hawai'i 359, 364, 82 P.3d 804, 809 (2004); *Roxas v. Marcos,* 89 Hawai'i 91, 116, 969 P.2d 1209, 1234

(1998). An order granting or denying a motion for reconsideration is reviewed for abuse of discretion. *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 110, 58 P.3d 608, 616 (2002); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114, 839 P.2d 10, 26 (1992). An abuse of discretion occurs where "the [circuit] court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *UFJ Bank Ltd. v. Ieda,* 109 Hawai'i 137, 142, 123 P.3d 1232, 1237 (2005) (citing *Roxas,* 89 Hawai'i at 115, 969 P.2d at 1233) (brackets in original).

### IV.

Inasmuch as the parties do not dispute that the business of subleasing is subject to the GET, we need not reach the Director's first argument. Accordingly, we address the parties' remaining contentions.

### V.

■ As to Taxpayer's argument 1(a), for strict construction of HRS § 237–2, we note that Taxpayer never presented this issue before the court. We have held that "[a]s a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses,* 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003). We have also previously stated that issues not raised at trial will not be considered on appeal "unless justice so requires." *Bitney v. Honolulu Police Dep't,* 96 Hawai'i 243, 251, 30 P.3d 257, 265 (2001). Taxpayer proffers no reason for us to address this issue.[7]

### VI.

#### A.

■ In support of Director's argument 2(a), that Taxpayer was engaged in a business activity with the object of gain or economic benefit, the Director contends that the

---

7. Our reading of HRS § 237–2 indicates that the statute is plain and unambiguous and, as such,

Taxpayer's argument for strict construction is inapposite.

lease agreement between Taxpayer and the landlords provided Taxpayer with several rights including (1) limiting the landlord from renting other properties within a one-mile radius to companies in direct competition with Taxpayer, (2) allowing Taxpayer to assign a sublease without prior consent of the landlord to another franchisee, and (3) giving Taxpayer responsibility for liability or enforcement of the provisions in the agreement.

The Director further asserts that the sublease agreement between the Taxpayer and the franchisees provided Taxpayer the economic benefits of (1) relieving Taxpayer from monetary responsibilities contained in the lease agreement such as advance rental payment, monthly rental payment, utility fees, security deposit payments, common area charges, maintenance fees, insurance fees, liens, taxes, and rental escalations, and imposing these responsibilities on the franchisee; (2) absolving Taxpayer from performing all obligations under the lease agreement including obtaining fire and liability insurance, indemnifying the landlord for certain acts, obtaining the proper permits and licenses to operate the Subway Sandwich shop, and repairing and maintaining the property, and placing the obligations on the franchisee; (3) authorizing Taxpayer to terminate the sublease on ten days' written notice to the franchisee upon the non-performance of certain terms of the sublease agreement, and upon termination of the sublease, requiring the franchisee to surrender the leased premises to Taxpayer as well as directing that the franchisee be liable to the Taxpayer for the balance of the rent; (4) providing that the franchisee seek the consent of Taxpayer in order to sublease the property to another franchisee and that Taxpayer's consent not release the franchisee from its obligations under the sublease agreement; (5) authorizing Taxpayer to enforce the provisions of the lease agreement with the landlord for the benefit of the franchisee; and (6) allowing Taxpayer to terminate and evict a franchisee expeditiously.

In response, under its argument 1(b), Taxpayer avers that it "did not purport to be engaged in a business activity for gain or economic benefit." According to Taxpayer, "[i]t had no assets, employees, or offices in Hawaii[,] ... [and] did not treat the subleases as assets on its books, nor recognize[ ] rental income or rental expense from its passive role in DAI's franchise agreement." Furthermore, Taxpayer asserts that it "did nothing more than sign the [m]aster lease[,]" without an intent to receive compensation, and "did not receive any fees or other consideration from either DAI or the franchisees for its role in facilitating the franchise arrangement." Taxpayer maintains that the examples of economic benefit cited by the Director "describes benefits that run to DAI," and not to itself.

### B.

HRS § 237–13 (Supp.2005) provides in relevant part that "[t]here is hereby levied and shall be assessed and collected annually *privilege taxes against persons on account of their business and other activities in the State* measured by the application of [prescribed] rates against values of products, gross proceeds of sales, or gross income[.]" [8] As stated *supra,* HRS § 237–2 includes within the term "business" "*all activities* (personal, professional, or corporate), engaged in or caused to be engaged in *with the object of gain or economic benefit either direct or indirect,* but does not include casual sales." (Emphases added.) As previously noted, HRS § 237–13(10) levied "[u]pon every person engaging or continuing within the State in any business, trade, activity, occupation, or calling ... a tax equal to four percent of the gross income thereof."

8. HRS § 237–3 (2001 Repl.) defines the term "gross income," in pertinent part, as follows:
[G]ross receipts, cash or accrued, of the taxpayer received as compensation for personal services and *the gross receipts of the taxpayer derived from trade, business, commerce,* or sales and the value proceeding or accruing from the sale of tangible personal property, or service, or both, and *all receipts, actual or accrued as* hereinafter provided, by reason of the investment of the capital of the business engaged in, including interest, discount, *rentals,* royalties, fees, or other emoluments however designated and without any deductions on account of the cost of property sold, the cost of materials used, labor cost, taxes, royalties, interest, or discount paid or any other expenses whatsoever.
(Emphases added.)

We have previously stated that "Hawaii's [GET] is a gross receipts tax on the privilege of doing business in Hawai'i, thus Hawaii's [GET] tax is a privilege tax." *Baker & Taylor*, 103 Hawai'i at 365, 82 P.3d at 810. *See also In re Tax Appeal of Grayco Land Escrow, Ltd.*, 57 Haw. 436, 447, 559 P.2d 264, 272 (1977) (holding that the GET "is based on the privilege or activity of doing business within the State and not on the fact of domicile"). "In enacting . . . (the GET), the legislature cast a wide and tight net." *In re Tax Appeal of Island Holidays, Ltd.*, 59 Haw. 307, 316, 582 P.2d 703, 708, *reh'g denied*, 59 Haw. 408, 582 P.2d at 709 (1978). The tax is "imposed upon entrepreneurs for the privilege of doing business," and "applies at all levels of economic activity . . . and to virtually all goods and services." *In re Tax Appeal of Cent. Union Church*, 63 Haw. 199, 202, 624 P.2d 1346, 1349 (1981).

In *Baker & Taylor*, the taxpayer, a Delaware corporation with its principal place of business in Charlotte, North Carolina, argued that the assessment of GET on the sale of goods was in error because title of the goods passed on the mainland and, thus, no sale of goods occurred in Hawai'i to justify the imposition of the GET. 103 Hawai'i at 365–66, 82 P.3d at 810–11. Although the taxpayer in *Baker & Taylor* did not have any offices, employees, or real property in Hawai'i, we held that, inasmuch as the taxpayer actively engaged in soliciting sales within this state, the taxpayer received the "benefits and protections of the laws of the [S]tate, including the right to resort to the courts for the enforcement of its rights." *Id.* at 366–67, 82 P.3d at 811–12 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Accordingly, we concluded that a sufficient basis existed in that case to impose the GET. *Id.* at 367, 82 P.3d at 812.

The Director asserts that Taxpayer does have assets within Hawai'i, namely, the various lease and sublease agreements which Taxpayer declared as assets in its federal income taxes. We also note that the standard form lease agreement does state that "[Taxpayer's] assets consist almost exclusively of leases, subleases, and options to purchase leased premises."

However, Taxpayer maintains that no gain or economic benefit accrued because it did not treat the subleases as assets, nor realized income on such activities. In *In re C. Brewer*, the taxpayer performed managerial and administrative services for wholly-owned subsidiaries. 65 Haw. at 241, 649 P.2d at 1156. In performing the services, the taxpayer incurred certain "overhead and administrative expenses." *Id.* at 241 n. 1, 649 P.2d at 1156 n. 1. Such expenses were treated as contributions to capital of the wholly owned subsidiaries and no consideration was paid to the taxpayer. *Id.* at 242–43, 649 P.2d at 1157. After the Director assessed the GET, the taxpayer paid under protest and appealed to the tax appeal court, which affirmed the Director's determination. *Id.* at 243, 649 P.2d at 1157.

On appeal, this court held that, despite the lack of compensation, reimbursement, or other consideration from the taxpayer's wholly-owned subsidiaries, or the fact that no income was accrued on the taxpayer's books and records, the GET was properly imposed. *Id.* at 241, 649 P.2d at 1156. *In re C. Brewer* reasoned that "[t]hough it may be axiomatic that a taxpayer can order its affairs in any manner not proscribed by law to minimize the impact of taxation, the Director is by no means bound by its accounting practices[,]" *id.* at 246, 649 P.2d at 1158–59, and that the "[a]ctualities and consequences of a commercial transaction, rather than the method employed in doing business, are controlling factors in determining liability[,]" *id.* at 246, 649 P.2d at 1159 (quoting *In re Kobayashi*, 44 Haw. 584, 590, 358 P.2d 539, 543 (1961)).

### C.

In response to Taxpayer's contention that it did not realize rental income for its passive role in the leasing transactions, the Director states that "[w]hile the [Taxpayer] did not physically receive the sublease rental payments pursuant to the [sublease agreements,] . . . the [Taxpayer] *constructively received* these amounts by virtue of being the sublessor." (Emphasis in original.) The Director argues that "[Taxpayer] does not need

to receive physically the rental payments for the payments to be treated as gross income." Citing to this court's opinion in *In re Tax Appeal of Aloha Airlines, Inc.*, 56 Haw. 626, 547 P.2d 586 (1976), the Director maintains that "income is taxed to the party who earns it and that liability may not be avoided by an anticipatory assignment of income." *See also Lucas v. Earl*, 281 U.S. 111, 113–14, 50 S.Ct. 241, 74 L.Ed. 731 (1930) (holding that husband's entire salary was taxable notwithstanding agreement with wife to hold any acquired property as joint tenants); *Palmieri v. Comm'r*, 27 T.C. 720, 721, 1957 WL 900 (1957) (concluding that "one who truly possesses the right to receive income is taxable thereon even though the actual receipt of the income is channeled directly into the hands of another"); *Fouche v. Comm'r*, 6 T.C. 462, 469, 1946 WL 197 (1946) (holding that under the doctrine of constructive receipt, actual receipt of payment is not required for the recognition of income).

In *Aloha Airlines*, the taxpayer airline authorized its agents to sell air passenger transportation in exchange for a commission based on a percentage of the fares and charges. 56 Haw. at 626, 547 P.2d at 586–87. Under the agreement between the taxpayer and the agents, proceeds of the sale of airline tickets, less the applicable commissions, were to be held in trust for the taxpayer until accounted for by the taxpayer. *Id.* at 627, 547 P.2d at 587. The agents were not entitled to a commission unless the passenger was actually transported under the terms of the airline ticket. *Id.* The commissions were not required to be remitted by the agents and never came into the taxpayer's possession. *Id.*

The taxpayer in *Aloha Airlines* was subjected to gross income tax under HRS chapter 239, based on an amount which included the commissions to the agents. *Id.* The taxpayer argued that the commissions never became property of the taxpayer and therefore should not have been included as part of its taxable gross income. *Id.* On appeal, this

court noted that "the agents were not entitled to their commissions unless and until the service was actually rendered by taxpayer." *Id.* Hence, the court stated that such amounts constituted gross income of the taxpayer. *Id.*

The instant case, like *Aloha Airlines*, demonstrates the application of the anticipatory assignment doctrine. Under this doctrine, Taxpayer cannot be excused from its liability for GET by channeling the sublease payments directly to the landlords. To permit Taxpayer to do so would directly subvert the overall scheme of HRS chapter 237 to tax "all levels of economic activity." *Cent. Union Church*, 63 Haw. at 202, 624 P.2d at 1349. Furthermore, we are not convinced that Taxpayer had a "passive role" in the subleasing transactions involved. As discussed *infra*, Taxpayer alone may enforce the sublease agreements and derives economic benefits from these agreements. Moreover, we are not persuaded by Taxpayer's argument that its claimed "passive role" in the subleasing transaction excuses Taxpayer from its GET liability.

### D.

The words "gain or economic benefit" have been afforded broad meaning in other jurisdictions. In *CB & T Operations Co. v. Tax Comm'r of the State of W. Virginia*, 211 W.Va. 198, 564 S.E.2d 408 (2002), a case concerning the imposition of an excise tax[9] for the leasing of data-processing equipment, the Supreme Court of Appeals of West Virginia, quoting its previous decision in *So. States Coop., Inc. v. Dailey*, 167 W.Va. 920, 280 S.E.2d 821, 828 (1981), noted that the phrase "gain or economic benefit" should be afforded broad meaning:

It cannot seriously be contended that Southern States derives no gain or economic benefit from its wholesale transactions with its affiliated cooperatives. It is true that the transfers of property from Southern States to its local cooperatives

---

9. The statute involved in *CB & T Operations Co. v. Tax Comm'r of the State of W. Virginia*, 211 W.Va. 198, 564 S.E.2d 408 (2002), is similar to HRS § 237–2 and defined "business," in relevant part, as "any activity engaged in by any person

... *with the object of direct or indirect economic gain, benefit or advantage,* and includes any purposeful revenue generating activity ..." W. Va. Code § 11–15A–1(1) (1986) (emphasis added).

are made on an actual cost basis, and therefore Southern States derives no direct profit from the transaction. *However, the statute here involved, W. Va.Code § 11–13–1, does not refer to "profit", but to "gain or economic benefit." Gain or economic benefit is a much broader term than profit,* and includes the benefits Southern States receives from dealings with its cooperatives.

*CB & T,* 564 S.E.2d at 413–14 (emphasis added) (citations omitted). *See also Bonnar–Vawter, Inc. v. Johnson,* 157 Me. 380, 173 A.2d 141, 144 (1961) (concluding that "[o]ne may engage in a business activity with an object of 'gain, benefit or advantage' and not necessarily for profit"); *State ex rel. City Loan & Sav. Co. of Wapakoneta v. Zellner,* 133 Ohio St. 263, 13 N.E.2d 235, 238 (1938) (same).

Here, the Director assessed the GET against Taxpayer for the gross income attributed to it from subleasing property to DAI's franchisees under HRS § 237–13(10) that was derived from the lease and sublease rental rates. The record indicates that Taxpayer, through its sublease agreements, acquired substantial economic benefits from these agreements including, *inter alia,* the power to prohibit landlords from leasing to DAI's competitors, the right to assign subleases without a landlord's consent, the capacity to enforce provisions of the sublease agreement, the benefit of being relieved from monetary responsibilities arising from the sublease, the authority to enforce terms of the lease against the franchisees by an expe-

dited eviction process, the power to hold a franchisee responsible for obligations under the sublease agreement even if the franchisee opts to sublease the property to another franchisee, and the ability to enforce the terms of the sublease agreement against the landlord on behalf of the franchisee. The Director also correctly contends that "an out of state corporation or individual does not have to be domiciled in the State to be subject to the GET." *See Grayco,* 57 Haw. at 447, 559 P.2d at 272 (stating that the GET "is based on the privilege of doing business in the State and not on the fact of domicile"); *In re Tax Appeal of Heftel Broad. Honolulu, Inc.,* 57 Haw. 175, 182–83, 554 P.2d 242, 247–48 (1976) (holding that an out-of-state lessor who contracted with an in-state lessee for film and telecast rights was engaged in an in-state activity subject to the GET).

Hence, inasmuch as Taxpayer gained or economically benefitted from the subleasing transactions at issue, we conclude that the Director's assessment and imposition of the GET for Taxpayer's subleasing activities was proper.[10]

## VII.

In its argument 2, Taxpayer states that the substance-over-form doctrine should apply in the instant case. According to Taxpayer, its subleases were security instruments for DAI and therefore, its GET liability should be based on the substance, rather than the form, of DAI's franchise agreement. Taxpayer relies on this court's holding in *In*

---

10. The Director also states that the legislative history of HRS chapter 237 "indicates that the legislature recognized that leasing and subleasing of the same parcel of property resulted in the imposition of the GET on both the lessor's and sublessor's rental income resulting in tax pyramiding." (Citing Sen. Stand. Com. Rep. No. 804, in 1997 Senate Journal, at 1211 and Hse. Stand. Com. Rep. No. 1665, in 1997 House Journal, at 1755). HRS § 237–16.5 (Supp.2005) was enacted in order to "alleviate the pyramiding of the [GET] on real property lease transactions." Sen. Stand. Com. Rep. No. 804, in 1997 Senate Journal, at 1211. Under the statute, sublessors are allowed to reduce their gross income from sublease rents on a phased-in basis by an amount up to seven-eighths of the rent paid to their own lessors. HRS § 237–16.5. We observe that "this court has used subsequent legislative history or

amendments to confirm its interpretation of an earlier statutory provision." *Franks v. City & County of Honolulu,* 74 Haw. 328, 340 n. 6, 843 P.2d 668, 674 n. 6 (1993). The legislative history confirms that the GET was imposed at different levels of the subleasing chain:

Your Committee finds that this bill solves a long-time structural problem concerning the application of the [GET] in multiple leasing situations. *Where there is a lessor, a first sublessee, a second sublessee, and a third sublessee, the third sublessee pays the GET on all previous sublessees and the lessor resulting in an imposition of twelve percent on the final sublessee.* All of this tax is then passed on to the consumer. *This bill provides that multiple taxation of the same gross proceeds will not occur.*

Sen. Stand. Com. Rep. No. 804, in 1997 Senate Journal, at 1211–12 (emphases added).

*re Tax Appeal of Hawaiian Tel. Co., supra,* to support its position.

In *Hawaiian Tel.,* the taxpayer provided telephone services to the United States Government (the Government) at tariff rates approved by the Hawai'i Public Utilities Commission. 57 Haw. at 479–82, 559 P.2d at 285–87. The parties entered into an agreement wherein the taxpayer was permitted to utilize existing telecommunications equipment and facilities owned by the Government. *Id.* The taxpayer would then bill the Government, in a net amount determined by applying a credit for the use of the equipment to the approved rate. *Id.* at 482, 559 P.2d at 287. This net amount was then used by the taxpayer as the basis for determining its public service company tax,[11] while applying substantially the full amount of the credit to its "Rent for Lease of Operating Property" account. *Id.*

In *Hawaiian Tel.,* the Director argued that the taxpayer should be responsible for the public service company tax on the gross amount of its tariff charges, without a deduction for the offsetting credit. According to the Director, two separate transactions were involved, namely, (1) a service contract under which taxpayer was paid the gross amount of its tariff charges for the services it rendered, and (2) a lease arrangement whereby the taxpayer paid rent to the Government for use of the equipment and facilities. *Id.* at 486, 559 P.2d at 289. The tax appeal court in *Hawaiian Tel.* agreed with the Director and concluded that the assessment based on the gross amount was proper. *Id.*

On appeal, this court disagreed, stating that "tax liability is governed by the substance of a transaction, rather than its form." *Id.* at 488, 559 P.2d at 290 (citing *In re Kobayashi,* 44 Haw. at 590, 358 P.2d at 543). According to *Hawaiian Tel.,* the substance-over-form doctrine may be asserted by a taxpayer if it can be shown that a tax advantage was not the motivating factor in the adoption of the form in controversy. *Id.*

It was held that the taxpayer properly paid the tax on the net amount less the credit because, in substance, the two agreements were "inseparable parts of a single transaction." *Id.* This court observed that the equipment and facilities at issue were not the taxpayer's properties, that the taxpayer was not required to pay rent, credited amounts were not business expenses of the taxpayer, tariff rates did not consider the fact that the properties were owned by the Government, tariff rates were scheduled for administrative convenience, the Federal Communications Commission rules compelled the taxpayer to follow the accounting methods it employed, and the accounting did not reflect the substance of the transaction between the taxpayer and the Government. *Id.* at 491, 559 P.2d at 292. Hence, this court decided that although a lease agreement may have existed in form, the substance of the transaction in that case dictated that the gross income of the taxpayer was the net return from the Government, as established by an agreed upon compensation formula, and that the taxpayer's tax liability should be based on that net amount. *Id.* at 491–92, 559 P.2d at 292.

According to Taxpayer, similar to *Hawaiian Tel.,* the sublease transactions were fashioned as they were because DAI uses "the same security arrangement for Hawaii franchisees that was used for all other DAI franchisees nationwide" which "served an administrative convenience and consistency purpose to benefit DAI." Taxpayer further states that "[t]his is not a typical leasing transaction," and that, like *Hawaiian Tel.,* the lease and subleases were "inseparable parts of a single transaction."

Taxpayer also relies on this court's holding in *In re Tax Appeal of Ulupalakua Ranch, Inc.* 52 Haw. 557, 481 P.2d 612 (1971). In *Ulupalakua Ranch,* the seller of ranch prop-

---

11. In lieu of paying GET, public utilities were required to pay the state a public service company tax under HRS § 239–5(a) (Supp.1989) which stated, in pertinent part:

There shall be levied and assessed upon each public utility ... a tax of such rate per cent of its gross income each year from its public utility business as shall be determined in the manner hereinafter provided. *The tax imposed by this section is in lieu of all taxes other than those below set out,* and is a means of taxing the personal property of the public utility, tangible and intangible, including going concern value....

(Emphasis added.)

erty required that the purchase be in the form of a sale of the holding company's capital stock, rather than by a direct sale of assets, including the livestock. *Id.* at 558, 481 P.2d at 613. Because the prospective purchasers, the Coberlys, lacked the capital to purchase the capital stock outright, they approached Erdman, who would later form Ulupalakua Ranch, Inc. (URI), the taxpayer, proposing that he acquire the capital stock using the Coberlys' funds supplemented by funds of his own. *Id.* Under the agreement, after the sale was consummated, the Coberlys would have the right to purchase a portion of the ranch along with the livestock therein for a specified amount from URI. *Id.* According to Erdman, he decided to use a corporation so that he could operate the remaining portion of the ranch in a corporate form. *Id.* at 561, 481 P.2d at 614. Following the sale, (1) URI dissolved the holding company, (2) a trustee in dissolution was appointed by the state director of regulatory agencies, (3) the trustee conveyed to URI all the assets of the holding company except for a portion reserved for payment of debts and expenses, and (4) URI executed and delivered to the Coberlys a deed to a portion of the ranch and a bill of sale of the livestock thereon. *Id.* at 559, 481 P.2d at 613.

In *Ulupalakua Ranch,* the Director assessed GET against URI, positing that the transaction should be treated as a sale of tangible personal property. The tax appeal court disagreed with the Director, concluding that no sale in substance occurred because an agreement between URI and the Coberlys existed for the joint purchase of the assets of the ranch with the object of dividing the assets between URI and the Coberlys. *Id.* at 560, 481 P.2d at 614. The tax appeal court found that the transfer of the livestock was only made because the seller insisted that the transaction be in the form of a stock sale instead of a direct sale of assets. *Id.*

This court upheld the tax appeal court's decision, indicating that the substance of the transaction, rather than its form, governed in determining URI's liability. *Id.* It was decided that in order for URI to invoke the substance-over-form doctrine, it must show "that consideration of a tax advantage was not the motivating factor in the adoption of the form in controversy." *Id.* This court further concluded that "[w]here a taxpayer resorts to a particular form to gain some specific tax advantage for himself, he is held to abide by the form." *Id.* (citing *Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940)).

The *Ulupalakua Ranch* court observed that URI and the Coberlys could have purchased the capital stock jointly, and divided the assets between themselves in order to avoid the formality of a sale. *Id.* at 561, 481 P.2d at 614. However, because Erdman had chosen to run the ranch in a corporate form, and for no other reason, there was a sufficient showing that tax considerations were not the motivating factor behind the formation of the corporation and the form of the transaction. *Id.* at 561–62, 481 P.2d at 614–15. Hence, this court concluded that no taxable event occurred on the execution of the deed between URI and the Coberlys to trigger the imposition of the GET.

According to Taxpayer, both *Hawaiian Tel.* and *Ulupalakua Ranch* are applicable to the instant case. Taxpayer states that in these cases, this court "disregarded the form of the transactions in favor of their actual substance notwithstanding the fact that the [taxpayers in those cases] derived clear economic benefit from the form used." However, we are not persuaded by this contention.

As noted before, Taxpayer argues that the transactions were made simply for "administrative convenience and consistency." But as said earlier, under its circular, DAI lists Taxpayer as a corporation that may act as a sublessor of restaurant premises, that Taxpayer is empowered to terminate the subleases and require the franchisee to vacate the premises through legal action, and may be involved in litigation in various jurisdictions with respect to certain leases and subleases. Hence, DAI has recognized that Taxpayer is a separate corporate entity that can sue and be sued for breach of the lease agreements. Such arrangement goes beyond what Taxpayer terms "administrative convenience and consistency," and therefore, we cannot agree with Taxpayer's argument.

We also do not concur with Taxpayer's attempt to characterize the subleases as security instruments for DAI. The record indicates that DAI is not a party to the subleases and that any default in the subleases may only be enforced by Taxpayer. As the Director points out, the primary arrangement between DAI and its franchisees is contained in the franchise agreement. In the event of a default of the franchise agreement, DAI is provided with remedies under that document, including the reversion to DAI of any rights conferred on the franchisee, the right to recover any lost royalties, and the right to recover costs and expenses in reestablishing the franchise. If a security interest exists between DAI and its franchisees, the interest arises from the franchise agreement and not from the subleases. Accordingly, we hold that the substance-over-form doctrine is not applicable to the instant case.

## VIII.

■■■■ In its argument 3(a) and (b), Taxpayer contends that assuming, *arguendo*, it was engaged in a business activity, any gross receipts from rental income are exempt under the reimbursement provisions of HRS § 237–20. As earlier stated, HRS § 237–20 provides, in pertinent part, that "[t]he reimbursement of costs or advances *made for or on behalf of one person by another* shall not constitute gross income of the latter, *unless the person receiving such reimbursement also receives additional monetary consideration for making such costs or advances.*" (Emphases added.) We first note that, in general, "exemptions from taxation are strictly construed against the taxpayer." *Grace Bus. Dev. Corp. v. Kamikawa*, 92 Hawai'i 608, 613 n. 4, 994 P.2d 540, 545 n. 4 (2000) (quoting *In re Tax Appeal of Aloha Motors*, 56 Haw. 321, 326, 536 P.2d 91, 94 (1975)).

In *Aloha Motors*, this court considered whether payments received by a taxpayer, seller of automobiles, for warranty work performed pursuant to an agreement with the manufacturer of the vehicles, qualified as reimbursements under HRS § 237–20 or constituted gross income subject to the GET. This court explained that HRS § 237–20 pro-vides an exemption from the GET for reimbursements. 56 Haw. at 326, 536 P.2d at 95. It was said:

The relevant provision does not modify the general proposition that in the imposition of the [GET], costs are included as part of one's gross income. The statute provides: "reimbursement of costs or advances ... shall not constitute gross income of the latter, unless the person receiving such reimbursement also receives additional monetary consideration for making such costs or advances." *Thus, the exemption from the [GET] prevails unless the recipient is paid "additional monetary consideration for making such costs or advances". In other words, if the recipient is reimbursed the "costs or advances" plus "additional monetary consideration for making such costs or advances", the reimbursement then loses its exemption status.*

*Id.* at 326–27, 536 P.2d at 95 (quoting HRS § 237–20) (emphasis added). Utilizing that analysis, this court held that the payments made to the taxpayer did not constitute reimbursements under HRS § 237–20 because that statute "was intended to cover *the flow of property or service from a third party to the taxpayers for which the taxpayers paid a monetary consideration and were then subsequently reimbursed by the manufacturers.*" *Id.* at 327, 536 P.2d at 95 (emphasis added). Furthermore, the tax appeal court strictly construed HRS § 237–20 by defining the term "costs" as used in that statute to mean "a monetary amount paid out by the Taxpayers for a property or service furnished by a third party," that did not include indirect expenses. *Id.* at 331, 536 P.2d at 97–98. On appeal, this court adopted the reasoning of the tax appeal court. With regard to the definition of "costs," this court, quoting the tax appeal court, stated as follows:

Items of expenses, direct or indirect, differ with each business entity and from business to business.... Verification of these costs and expenses could well be costly on the part the Director. The result will be to impose upon the Director the tremendous administrative and financial burden of auditing and examining all items of expense, direct or indirect, for

each piece of warranty work. Such an administrative task would make it extremely difficult, if not impossible, to administer and to enforce the tax laws.... Economy in administration is a proper factor for consideration in the assessment of taxes. *Henneford v. Silas Mason Co.*, 300 U.S. 577, 588, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

*Id.* Accordingly, this court affirmed the tax appeal court's decision.

The exemption under HRS § 237-20 was determined by this court to apply in *In re Tax Appeal of Pac. Mach., Inc.*, 65 Haw. 45, 647 P.2d 288 (1982) [hereinafter, *Pacific*]. In *Pacific*, the taxpayer entered into an agreement with an advertising agency to advertise the manufacturer's equipment. *Id.* at 45–46, 647 P.2d at 289. Under a separate agreement, the manufacturer, Caterpillar, agreed to bear fifty percent of the advertising expenses. *Id.* at 46, 647 P.2d at 289. The taxpayer in that case billed Caterpillar for fifty percent of the advertising costs, which Caterpillar reimbursed. *Id.* The Director assessed GET on the reimbursements the taxpayer received from Caterpillar. The tax appeal court ruled in favor of the taxpayer, finding that the billing to Caterpillar did not include any costs for overhead, salaries, or other internal expenses or profit incurred by the taxpayer. *Id.* The tax appeal court also found that the reimbursements were not for payment for services performed by the taxpayer, or for internal costs incurred by the taxpayer in connection with advertising Caterpillar products. *Id.* The tax appeal court concluded that the taxpayer was not taxable on the reimbursements. *Id.* Based on the tax appeal court's findings, this court affirmed.

In the instant case, Taxpayer avers that the contractual relationships in *Pacific* "are very similar to the contractual relationships in [Taxpayer's case]." It appears that Taxpayer characterizes the lease and sublease transactions as one where the landlords provided rental space to Taxpayer, for which

Taxpayer paid a monetary consideration, and Taxpayer was reimbursed by the franchisees.

However, Taxpayer's analogy fails for two reasons. First, Taxpayer has not paid any costs or made any advances to the landlords. The record before us does not indicate that Taxpayer transmitted any monetary amounts to the landlords. Taxpayer simply maintains that "the franchisee agrees in advance to 'reimburse' [Taxpayer] for all rents and costs under the [lease] by executing the [f]ranchise [a]greement," but fails to demonstrate that any monetary advances were made for the subleases in question. Second, the record does not indicate that Taxpayer received a reimbursement of a cost or advance. The sublease document required a franchisee to pay the landlord. Accordingly, we hold that the reimbursement provision of HRS § 237-20 does not apply in the instant case.[12]

## IX.

With regard to Taxpayer's first argument on cross-appeal, Taxpayer states that any services that were performed were performed by FRELC, and not by Taxpayer, for the benefit of DAI and its franchisees. Taxpayer maintains that Taxpayer, FRELC, and DAI "are legally separate and distinct entities[,]" and that it was error for the court to impose tax liability based on services performed by FRELC. However, the Director asserts that "[t]he stipulation resolved the issue of [Taxpayer's] tax liability based on the value of services that [Taxpayer] provided."

█ We first note that the parties are bound to the stipulation unless such agreement is set aside. *Office of Disciplinary Counsel v. Lau*, 79 Hawai'i 201, 204, 900 P.2d 777, 780 (1995). We recognize that stipulations may be set aside "in order to prevent manifest injustice." *Id.* The parties do not argue that the stipulation must be set aside or proffer any reason for doing so.

The imposition of the GET for services falls within the purview of HRS § 237-13(6)

---

12. We agree with the Director's proposition that Taxpayer's argument 3(c) need not be addressed as the Director correctly states that the "[p]ro-

posed rules have not been adopted and do not have the force of law." Hence, we do not discuss this argument.

(Supp.2005) which states in pertinent part as follows:

> Upon every person engaging or continuing within the State in any service business or calling including professional services not otherwise specifically taxed under this chapter, there is likewise hereby levied and shall be assessed and collected a tax equal to four per cent of the gross income of the business[.]

HRS § 237–13(6)(A). We note that, based on the discussion *supra,* Taxpayer was involved in a "business" under HRS § 237–2. However, the Director never imposed GET on services performed by Taxpayer or FRELC. The court, *sua sponte,* determined that the Taxpayer should be liable for GET on services performed.

The record before us is insufficient to decide the issue of Taxpayer's liability for services rendered. While the parties have stipulated to the value of services provided by Taxpayer to DAI, genuine issues of material fact exist and were not resolved or considered as to the location of the services, the nature of the services, and the parties involved in these services. For this reason, we remand for resolution of the issues involved in Taxpayer's cross-appeal.

## X.

For the foregoing reasons, we vacate the court's March 9, 2004 final judgment, and remand with instructions to enter judgment in favor of the Director on the issue of Taxpayer's GET liability for its subleasing activities, and for a determination of Taxpayer's GET liability, if any, for services as posed in Taxpayer's cross-appeal.

